**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

REEWEN C. D'SOUZA-KLAMATH, M.D.,   )
                                     )
             Plaintiff,         )
                                     )
v.                                      )     Case No. 07-4031-KGS
                                     )
CLOUD COUNTY HEALTH CENTER, INC.,   )
and CLOUD COUNTY FOUNDATION        )
FOR HEALTH CARE, INC.,               )
                                     )
             Defendants.     )

## <u>MEMORANDUM AND ORDER</u>

This matter comes before the court upon defendant Cloud County Health Center, Inc.'s motion for summary judgment.[1]  Plaintiff has filed a response opposing the motion,[2] and defendant has filed a reply in support of its motion.[3]  The issues are fully briefed and are ripe for disposition.

The claims in this case arise from events during and after plaintiff's employment at defendant's medical facility.  The medical facility reported an incident of alleged substandard medical care to the state agency responsible for licensing physicians.  Plaintiff contends defendant's report was false and that defendant's motivation to make the report was not patient care but ill will toward plaintiff.  As a result, plaintiff brings claims for breach of contract, defamation, invasion of privacy through false light, retaliation against a whistleblower, tortious interference with a contract, and tortious interference with a prospective business relationship.  Plaintiff also asserts claims for

---

[1] *See* Defendants' Motion for Summary Judgment (Doc. 75).  The instant motion only concerns defendant Cloud County Health Center.  Co-defendant Cloud County Foundation for Health Care was previously dismissed.

[2] *See* Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 82).

[3] *See* Defendants' Reply Memorandum in Support of Motion for Summary Judgment (Doc. 85).

injunctive and declaratory relief.  Defendant argues it is entitled to immunity under Kansas laws

shielding hospitals and their staff for, in good faith, conducting peer review investigations and

reporting incidents of substandard medical care to the Kansas Board of Healing Arts. Defendant also

argues it is entitled to absolute immunity under the Medical Staff Bylaws.  Alternatively, defendant

argues plaintiff has failed to point to sufficient evidence to support his claims.  For the following

reasons, the court grants defendant's summary judgment motion.

## I.      Legal Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[4]

The court views the record in a light most favorable to the nonmoving party.[5]  For the purpose of

reviewing a summary judgment motion, a factual dispute is "material" only if it "might affect the

outcome of the suit under the governing law."[6]  A "genuine" issue of fact exists where "there is

sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

The moving party bears the initial burden of demonstrating the absence of a genuine issue

of material fact.[8]  To meet this standard, the moving party does not need to negate the claims of the

non-movant; instead, the moving party can simply point out the absence of evidence for the non-

---

[4] Fed. R. Civ. P. 56(c).

[5] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7] *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson,* 477 U.S. at 248).

[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991).

moving party on an essential element of that party's claim.[9]   Once the moving party satisfies this initial burden in a properly supported motion, the burden shifts to the non-moving party to show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[10]   The nonmoving party may not rest on mere allegations or denials in its response in opposition to summary judgment, but "must set forth specific facts showing that there is a genuine issue for trial."[11]   The mere existence of some alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment.[12]   However, in  response to a motion for summary judgment, a non-moving party "cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment on the mere hope that something will turn up at trial."[13]

## II.      Factual Background

As an initial matter, the court notes plaintiff's response brief has failed to comply with this district's local rule governing the manner in which a summary judgment motion should be briefed, thereby complicating the court's task of identifying controverted facts.  D. Kan. R. 56.1 requires that a memorandum in opposition to a summary judgment motion begin with a concise statement of material facts to which a genuine issue exists, and each fact in dispute "shall refer with particularity *to those portions of the record upon which the opposing party relies*, and, if applicable, *shall state*

---

[9]  *Adams v. Am. Guarantee & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

[10]  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990).

[11]  *Anderson*, 477 U.S. at 256.

[12]  *Id.*

[13]  *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988) (citing *Bryant v. O'Connor*, 848 F.2d 1064, 1067 (10th Cir. 1988)).

*the number of the movant's fact that is disputed.*"[14]  Under this rule, the moving party's facts "which are not admitted or denied will be deemed admitted."[15] Here, plaintiff's statement of facts is impermissibly riddled with legal arguments, conclusions, and facts not supported by any citation to the record.  Additionally, plaintiff has set forth a largely separate recitation of facts with few direct citations to defendant's facts.  Instead of addressing the substance of defendant's facts, plaintiff often focuses on different facts altogether.  However, D. Kan. R. 56.1(e) requires the responding party to  admit or deny the factual matter asserted or set forth a detailed response as to why it is unable to admit or deny the matter.  The rule further requires that "[a]ll responses shall fairly meet the substance of the matter asserted."[16]

The purpose of D. Kan. 56.1 "is to avoid such a misdirection of judicial resources."[17]  Indeed, the rule provides that "all material facts set forth in the statement of the movant *shall be deemed admitted* for the purpose of summary judgment *unless specifically controverted* by the statement of the opposing party."[18]  Accordingly, the court deems defendant's statement of facts admitted to the extent the facts find support in the record and where plaintiff has failed to specifically controvert

---

[14] D. Kan. R. 5.1(b)(1) (emphasis supplied).

[15] *Joshua W. v. Board of Educ. of Wichita Pub. Sch. U.S.D. No. 259*, 13 F. Supp. 2d 1199, 1205 n.6 (D. Kan. 1998).

[16] *See Raynor Mfg. Co. v. Raynor Door Co., Inc.*, No. 07-2421-DJW, 2009 WL 211942, at *3 (D. Kan. Jan. 27, 2009) (considering a response brief containing a recitation of facts that failed to properly meet the substance of the moving party's recitation of facts and concluding the responding party had failed to specifically controvert numerous facts); *see also Joshua W*, 13 F. Supp. 2d at 1205 (D. Kan. 1998) (considering a response to a summary judgment motion that provided only a separate narrative of facts, thereby "completely ignoring the statement of facts in [defendant's] motion" and therefore concluding "the facts presented to the court are wholly those presented by defendant").

[17] *Ransell v. Continental Cas. Co.*, No. 01-41133-JAR, 2004 WL 1846218, at *1 (D. Kan. August 8, 2004) (quoting *Joshua W.*, 13 F. Supp. 2d at 1205 n.5 (D. Kan. 1998)).

[18] D. Kan. R. 56.1(a) (emphasis supplied).

them.[19]  In determining whether the record supports a statement of fact, the court will only consider statements made by witnesses who have personal knowledge of the matters at issue.[20]  The court will not consider inadmissible hearsay evidence in deciding a summary judgment motion.[21]  Nor will the court consider challenged unauthenticated documents, which in this case includes an unauthenticated letter addressed to plaintiff from another physician.[22]  With these considerations in mind, the court now turns to the following facts, which are either uncontroverted or are viewed in a light most favorable to the plaintiff.

## A.  The Employment Agreement, Hospital Bylaws, and Peer Review Procedure

Defendant Cloud County Health Center ("CCHC") is a not-for-profit corporation located in Concordia, Kansas, conducting business as the Family Care Center and as the Cloud County Health Center hospital.  CCHC employed plaintiff Dr. Reewen D'Souza-Klamath as an internal medicine physician from January 27, 1999, to January 14, 2006.  CCHC and Dr. D'Souza entered into an employment agreement on January 17, 2003, which provided, among other things, that either party could terminate the contract if written notice was provided at least ninety days before the end of the contract term.  The employment agreement also provided that the physician was to comply with the

---

[19] *See Joshua W.*, 13 F. Supp. 2d at 1205 ("Rule 56.1 contains its own sanction — all of the facts presented in the defendant's motion will be deemed uncontroverted.").

[20] *See* Fed. R. Evid. 602 (requiring testifying witnesses to have personal knowledge of the matter); Fed. R. Civ. P. 56(e) (requiring affidavits be based upon personal knowledge and "set forth such facts as would be admissible in evidence"); *Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006) ("Under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to.").

[21] *Teff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996).

[22] *Tony v. Cuomo*, 92 F. Supp. 2d 1186, 1196 (D. Kan. 2000) (stating that documents must be attached to and authenticated by an affidavit that conforms to Fed. R. Civ. P. 56(e) and that the affiant must be a competent witness through whom the document could be received into evidence).

hospital's bylaws,[23] rules, and regulations.  The agreement further provided that the hospital had the freedom to engage in peer review.

Kansas regulations require hospitals to adopt bylaws.[24]  CCHC's bylaws outline a process for conducting peer review.  The bylaws provide that the entire medical staff shall serve as the hospital's peer review and risk management committee.  They state that the medical staff shall also have its own bylaws setting forth the organization and government of the medical staff (the "Medical Staff Bylaws").  The Medical Staff Bylaws expand on the proper procedure for peer review.  Pursuant to the Medical Staff Bylaws, the medical staff or the hospital administrator "shall direct" that a peer review investigation be undertaken when reliable information indicates a medical staff member has provided care "below applicable professional standards."[25]  The Medical Staff Bylaws further state that interviews with individuals may be conducted, and the medical staff member under investigation "shall be notified that an investigation is being conducted" and "shall have the opportunity to provide information in a manner  and upon such terms as the investigating body deems appropriate."[26]  Two CCHC physicians gave deposition testimony that circumstances triggering peer review include the transfer of a patient and instances in which a physician takes too long to see a patient.  Similarly, CCHC's "Emergency Room Case Peer Review Form" lists several reasons for review, including when a physician does not see a patient within thirty minutes of

---

[23] For the purposes of clarity, the court notes that CCHC has both a set of bylaws governing the hospital and a set of bylaws governing the medical staff (the "Medical Staff Bylaws").  Both sets of bylaws applied to Dr. D'Souza.

[24] *See* K.A.R. 28-34-5a(b).

[25] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. N, Cloud County Health Center Medical Staff Bylaws (Doc. 76-15) at p. 38.

[26] *Id.*

6

receiving notification.[27]

Dr. D'Souza contends CCHC had a policy requiring on-call physicians to see patients in the emergency room within forty-five minutes of receiving notification.  In an attempt to support this contention, Dr. D'Souza points to CCHC's Board of Trustees meeting minutes from August 26, 2005.  The minutes state that the medical staff recommended a change to the hospital's rules and regulations so that "the physician on call be required to see a patient in the ER within 30 minutes, rather than simply calling in orders."[28]  The minutes further state that the medical staff would vote on the proposed modification during the September meeting.  The September Board of Trustees meeting minutes state that the Medical Staff Bylaws may be reworded "to state that physicians will respond to [the] E.R. in a timely fashion, rather than 30 minutes.  The Q.A. [quality assurance] standards, however, will state that physicians should respond in 30 minutes."[29]  Likewise, Dr. Maria Jindra, a CCHC physician who worked with Dr. D'Souza, gave deposition testimony indicating she thought "at one point" CCHC physicians were required to see patients within forty-five minutes.[30]

### B.    Allegations of Substandard Care Provided to Patient K.H. and the Peer Review Investigation and Report

On March 27, 2005, patient K.H. was admitted to CCHC's emergency room concerning a heart condition.  At 6:10 a.m., a  nurse in the ER phoned Dr. D'Souza, who was on-call at the time.

---

[27] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. R, Cloud County Health Center Emergency Room Case Peer Review Form (Doc. 76-19) at p. 2.

[28] Memorandum in Opposition to Defendants' Summary Judgment Motion (Doc. 82), Ex. G, Board of Trustees Meeting Minutes, August 26, 2005, (Doc. 82-10) at p.2.

[29] Memorandum in Opposition to Defendants' Summary Judgment Motion (Doc. 82), Ex. H, Board of Trustees Meeting Minutes, September 23, 2005, (Doc. 82-11) at p.2.  The court is unable to determine the meaning of "Q.A. standards" but assumes this means quality assurance.

[30] Memorandum in Opposition to Defendants' Summary Judgment Motion (Doc. 82), Ex. G, Transcript of Dr. Maria Jindra Deposition (Doc. 82-8) at p.6.

Dr. D'Souza was called again at 6:50 a.m.  K.H.'s  medical records provide conflicting information about when Dr. D'Souza arrived — indicating on one page he was examining the patient at 6:55 a.m. and indicating on another page he arrived at 6:59 a.m. Upon examination, Dr. D'Souza diagnosed that K.H. was having a heart attack, and at 7:33 a.m., Dr. D'Souza administered tissue plasminogen activator ("tPA"), a common treatment for heart attacks.  He then transferred the patient to Salina Regional Medical Center, where she died the next day.

Several months later, CCHC declined to renew Dr. D'Souza's contract for reasons apparently unrelated to his treatment of K.H.  The hospital provided Dr. D'Souza with written notice of the decision on October 6, 2005.  A week later, the hospital's Professional Advisory Group met.  The meeting minutes state that "[w]ith Dr. D'Souza leaving we could lose some patients who want to see an internal medicine physician."[31]  The group decided to send letters to Dr. D'Souza's patients, encouraging them to see other CCHC physicians in light of Dr. D'Souza's departure.  During the medical staff meeting on November 10, 2005, members reviewed the K.H. matter and assigned a Standard of Care Level 3 to the treatment Dr. D'Souza provided.  "Standard of Care Level 3" is a term of art in the medical world.  Kansas regulations define it as "standard of care not met, with injury occurring or reasonably probable."[32]  An attorney at the Board of Healing Arts explained in her deposition that Kansas regulations define assignments of standard of care levels ranging from one to four.[33]  Only assignments of Standard of Care Level 3 or 4 are reportable to the Board of

---

[31] Memorandum in Opposition to Defendants' Summary Judgment Motion (Doc. 82), Ex. R, Professional Advisory Group Minutes, October 13, 2005, (Doc. 82-21) at p. 6.

[32] *See* K.A.R. 28-52-4(a)(3).

[33] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. W, Deposition Transcript of Shelly Wakeman (Doc. 76-24) at p. 3; *see also* K.S.A. 65-49239(a)(2) (requiring medical facilities and medical professionals to report certain instances of substandard care to the Board of Healing Arts).

Healing Arts, and Kansas law requires medical facilities to report these assignments.[34]  The meeting minutes indicate the medical staff committee voted to report the incident "because of the timeliness of the physician's response to evaluate the patient may have made injury reasonably probable."[35] The minutes further state the committee members were concerned that tPA and another treatment were not administered earlier.[36]

However, CCHC did not immediately make a report to the Board of Healing Arts.  At the medical staff meeting on December 8, 2005, members voted to have an outside, independent reviewer from the Kansas Medical Society ("KMS") examine the case.  The independent reviewer also assigned a Standard of Care Level 3 to the care Dr. D'Souza provided.  The report, dated March 16, 2006, expressed concerns with Dr. D'Souza's timeliness.  Specifically, the report indicated that Dr. D'Souza should have arrived within thirty minutes of receiving notification of K.H.'s presence in the emergency room and that Dr. D'Souza should have administered tPA earlier.[37]

On May 18, 2006, the medical staff committee voted to make a report to the Board of Healing Arts after considering the independent reviewer's findings.   By this time, Dr. D'Souza was no longer employed at CCHC. The hospital's report, dated  May 31, 2006, describes the K.H. incident in one paragraph:

> Description of Incident: 56 y/o patient presented to ER at 0600 with complaints of a syncopal episode, was diaphoretic and had jaw pain. The physician was called at 0610 and gave orders for lab work and

---

[34] *Id.*

[35] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. CC, Medical Staff Meeting, November 10, 2005, (Doc. 76-30) at p. 5.

[36] *Id.*

[37] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. EE, Report of the Independent Reviewer (Doc. 76-32).

> a chest x-ray.  EKG was done on admission and findings were given to physician at 0610.  Patient was in cardiogenic shock at 0651.  Physician was called a second time at 0650.  Arrived in ER at 0659.  He was on-call for the ER and lives 1 block from the hospital.  Physician ordered TPA at 0700 and it was administered at 0730.  Patient was MediVAC to an outlying facility at 0825 & dies in the process of left heart catherization.[38]

The report further states Dr. D'Souza was no longer on staff and that his "[c]ontract termination [was] not due to quality of care issues."[39]  The Board of Healing Arts initiated its own investigation in June but terminated it later that month when Dr. D'Souza gave notice that he did not wish to renew his Kansas license.  Dr. D'Souza claims he at no time ever received notification of CCHC's peer review, as the Medical Staff Bylaws require.  However, Dr. D'Souza does not dispute that he could have attended medical staff meetings while he was employed at CCHC, where he presumably would have received notice that a peer review investigation had been initiated.

Dr. D'Souza contends CCHC's report to the Board of Healing Arts was motivated by improper reasons.  By both parties' accounts, Dr. D'Souza and other CCHC physicians had a contentious relationship.  Dr. D'Souza had made complaints to Roy White, a hospital administrator, about instances in which he believed his colleagues provided substandard medical care.  In May 2005, tensions appeared to run high when CCHC physicians and other staff members sent Dr. D'Souza a letter stating that they would no longer cover his patients in the emergency room or Family Care Center. The letter also stated the staff members would not cover Dr. D'Souza's patients for inpatient services, during Family Care Center hours and staff members would no longer cover his telephone messages or provide lab and x-ray interpretations.

---

[38] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. GG, Report to the Kansas Board of Healing Arts, (Doc. 76-34) at p. 3.

[39] *Id.*

### C.     Dr. D'Souza's Other Employment Opportunities and his Move to Oregon

The Mowery Clinic is a hospital located in Salina, Kansas, approximately fifty miles from CCHC.  From about November of 2005 to June of 2006, Dr. D'Souza and the Mowery Clinic engaged in discussions about Dr. D'Souza beginning work at the hospital.  At some point, the Mowery Clinic offered Dr. D'Souza a position, but Dr. D'Souza declined the offer on June 14, 2006. That same month, Dr. D'Souza applied for a medical license in Oregon, having decided to relocate. The Oregon Board of Medical Examiners requires applicants to forward an employment verification form to former employers.  Accordingly, Dr. D'Souza sent the form to CCHC with instructions that CCHC return the form to the Oregon Board of Medical Examiners.  The form asks if there were "any concerns regarding the applicant's judgment, medical knowledge, performance or emotional stability?"[40]  CCHC responded: "One (1) case submitted to Kansas State Board of Healing Arts for quality concerns.  Contact State Board of Healing Arts for further information."[41]

Dr. D'Souza did not learn of the report to the Board of Healing Arts until the Oregon State Board of Medical Examiners inquired about why he omitted this information when he applied for an Oregon medical license.  Dr. D'Souza contends this incident delayed the receipt of his Oregon medical license, resulting in a loss of income.  Dr. D'Souza also contends he will suffer future damage because the Board of Healing Arts will disclose CCHC's report when future employers or licensing agencies inquire about Dr. D'Souza's Kansas license.

### III.    Analysis

Defendant's argument in favor of summary judgment is threefold.  First, CCHC contends

---

[40] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. B, Verification of Practice, Employment, Staff Membership Form (Doc. 76-3) at p. 4.

[41] *Id.*

it is entitled to qualified immunity under Kansas statutes shielding certain medical facilities from civil liability and damages for conducting peer review and reporting the findings to the Board of Healing Arts.  Second, CCHC contends it is entitled to absolute immunity under the Medical Staff Bylaws, which state that CCHC and its agents shall be immune from liability "for damages or other relief for any action taken or statements or recommendations made within the scope of his or her duties as a representative of the Medical Staff or Hospital and their committees."[42]  Third, in the alternative, CCHC argues Dr. D'Souza has not come forward with sufficient evidence to support his claims.  The court first addresses the issue of statutory immunity, as the parties have devoted substantial portions of their briefs to this issue, and next considers whether Dr. D'Souza can point to sufficient evidence supporting his claims.  Because the court finds summary judgment should be granted on the basis of insufficient evidence, the court need not address defendant's argument that it is entitled to absolute immunity under the Medical Staff Bylaws.

### A.      Statutory Immunity

"Peer review," is the process by which physicians evaluate the quality, efficiency and effectiveness of medical care provided by other physicians.  The Kansas Legislature has enacted several statutes providing qualified immunity for actions taken during the peer review process in order to "encourage hospitals to actively engage in peer review of staff physicians."[43]  The legislature codified these statutes with the belief that effective use of peer review would increase and

---

[42] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. N, Cloud County Health Center Medical Staff Bylaws (Doc. 76-15) at p. 50.

[43] *Donnell v. HCA Health Serv. of Kan..*, 28 P.3d 420, 425 (Kan. Ct. App. 2001) (quoting *Lemuz v. Fieser*, 933 P.2d 134 (Kan. 1997)).

be promoted with the threat of liability removed.[44]  In this case, the court must determine whether the  hospital is entitled to statutory qualified immunity pursuant to K.S.A. 65-4926.  The statute provides:

> Any person or entity, which, in *good faith,* reports or provides information or investigates any health care provider as authorized by K.S.A. 65-4923 or 65-4924 shall not be liable in a civil action for damages or other relief arising from the reporting, providing information or investigation except upon clear and convincing evidence that the report or information was completely false, or that the investigation was based on false information, and that the falsity was actually known to the person making the report, providing the information or conducting the investigation at the time thereof.[45]

Similarly, K.S.A. 65-2898(b) also applies to the facts of this case.  That statute provides:

> Any state, regional or local association composed of persons licensed to practice a branch of the healing arts and the individual members of the committee thereof, which *in good faith* investigates or communicates information pertaining to the alleged incidents of malpractice, or the qualifications, fitness or character of, or disciplinary action taken against, any licensee, registrant or certificate holder to the state board of healing arts or to any committee or agent thereof, shall be immune from liability in a civil action, that is based upon such investigation or transmittal of information if the investigation and communication was made *in good faith* and did not represent something as true any matter not reasonable believed to be true.[46]

---

[44] *Id.*

[45] K.S.A. 65-4926 (emphasis supplied).

[46]  K.S.A. 65-2898(b) (emphasis supplied).  CCHC also cites K.S.A. 65-442(a) in support of its position that it is immune from civil liability in this instance.  However, the court is not convinced this section applies to medical care facilities.  It provides:

> (a)     There shall be no liability on the part of, and no action for damages shall arise against, any duly appointed *member* of the governing board or the duly appointed *member* of a committee of the medical staff of a licensed medical care facility for any act, statement or proceeding undertaken or performed within the scope of the functions and within the course of the performance of duties of such committee of the medical staff if such member acted in

The immunity afforded by both statutes is predicated on good faith.[47] The issue of good faith is normally one for the factfinder.[48] When construing a similar peer review statute, the Kansas Supreme Court warned that "[a] court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties."[49]

CCHC has pointed to evidence in the record tending to show good faith, and Dr. D'Souza has pointed to evidence in the record tending to show a lack of good faith. CCHC argues it acted in good faith because it retained an external reviewer and because it was statutorily required to make the report to the Board of Healing Arts. Dr. D'Souza argues the factual timeline of events surrounding the K.H. incident demonstrates that CCHC was not concerned with the medical care Dr. D'Souza provided to his patient. Dr. D'Souza treated K.H. in March of 2005, but CCHC did not initiate peer review until November 2005, the month after the hospital provided Dr. D'Souza notice that it had declined to renew his contract. October minutes from CCHC's Professional Advisory Group state that "[w]ith Dr. D'Souza leaving, we could lose some patients who want to

---

good faith and without malice, and the medical staff operates pursuant to written bylaws that have been approved by the governing board of the medical care facility. (Emphasis suppled).

The plain language of the statute suggests that it applies only to individuals — members of a governing board and members of a committee. Research unearthed no case in which a court has directly applied this statute to a medical facility. The court does note that the Kansas Court of Appeals cited this subsection generally along with several other Kansas statutes pertaining to peer review when determining whether to affirm the district court's decision to grant defendants' motion for summary judgment. *Donnell*, 28 P.3d 420. The defendants in that case included a hospital, professional association, and chairman of the peer review committee. The court did not specifically analyze whether subsection (a) of the statute applied to the hospital and professional association.

[47] *See Smith v. Farha*, 974 P.2d 563, 568 (Kan. 1999) (applying statute providing a qualified privilege for members of the peer review committee and stating a similar proposition).

[48] *See id.*

[49] *Id.*

14

see an internal medicine physician."[50] Dr. D'Souza contends this timeline of events indicates CCHC had improper motives for initiating peer review.  Furthermore, Dr. D'Souza suggests that other CCHC physicians were motivated to make a false report to the Board of Healing Arts because he believes  they learned that Dr. D'Souza had expressed concerns about the quality of care they provided to their patients.  He also contends they were jealous of his successful practice, which provided another reason for physicians to initiate peer review.  Finally, Dr. D'Souza alleges CCHC did not act in good faith as evidenced by its failure to adhere  to the Medical Staff Bylaws.  Specifically, CCHC never informed Dr. D'Souza that he was under investigation or gave him an opportunity to address the issue.

CCHC cites Kansas case law suggesting employee discord alone is usually not sufficient to demonstrate the absence of good faith, and indeed many of Dr. D'Souza's contentions are not supported by evidence in the record.  However, Dr. D'Souza has pointed to evidence other than employee discord that a reasonable jury could conclude shows a lack of good faith.  For example, Dr. D'Souza points out that CCHC failed to comply with the peer review procedures outlined in the Medical Staff Bylaws.  The bylaws outline the general process of peer review.  Section 10.3 of the bylaws applies to peer review investigations and provides in pertinent part:

> The investigation shall be conducted in a prompt manner and the Member shall be notified that an investigation is being conducted. The Member shall have the opportunity to provide information in a manner and upon such terms as the investigating body deems appropriate.

Dr. D'Souza never received notice of the peer review investigation. CCHC argues Dr. D'Souza could have learned of the investigation had he attended the medical staff meetings, where the

---

[50] Memorandum in Opposition to Defendants' Summary Judgment Motion (Doc. 82), Ex. R, Professional Advisory Group Minutes, October 31, 2005, (Doc. 82-21) at p. 6.

physicians reviewed and discussed the K.H. matter.  Although Dr. D'Souza may have learned of the investigation by attending these meetings, the plain language of § 10.3 indicates the hospital bore the duty of notifying Dr. D'Souza of the investigation.  CCHC has failed to cite any case law suggesting that a hospital's noncompliance with own bylaws in a peer review investigation is insufficient, as a matter of law, to show a lack of good faith.  In fact, research unearthed no opinion in which a court has directly spoken on this issue of a hospital's failure to abide by its own bylaws by not informing a physician he or she was the subject of a peer review investigation.  However, some opinions have suggested a hospital can demonstrate good faith by showing it abided by its bylaws.[51]  Therefore, it would seem logical that a plaintiff could attempt to demonstrate a lack of good faith showing a hospital failed to abide by its bylaws.  However, CCHC contends its failure to abide by its bylaws, at most, demonstrates its actions were sloppy and negligent, which is not enough to strip a hospital of statutory immunity.

CCHC cites the Kansas Court of Appeals decision *Donnell v. HCA Health Services* for its holding that members of a peer review committee who act in good faith and without malice are immune from liability even if their actions are sloppy and negligent and even if their conclusions are wrong.[52]  The plaintiff in *Donnell* was the subject of two peer review investigations, which ultimately resulted in the suspension of his staff privileges.  For the purposes of deciding the

---

[51] *See, e.g., Harris v. Bellin Mem. Hosp.*, No. 90-C-1197, 1992 WL 560913, at *14 (E.D. Wis. May 29, 1992) ("In addition, the Hospital in large part followed the bylaws.  Although this does not conclusively show that the Hospital acted in good faith, it supports that inference."); *see also Smith v. Our Lady of the Lake Hosp., Inc.*, 639 So. 2d 730, 756 (La. 1994) (finding that although the hospital failed to strictly comply with its bylaws, the hospital substantially complied with the bylaws and therefore, minor deviations from the bylaws were insufficient to show malice or lack of good faith); Pauline Martin Rosen, *Medical Staff Peer Review: Qualifying the Qualified Privilege Provision*, 27 LOY. L.A. L. REV. 357, 379-89 (1993) (proposing factual situations that would indicate a lack of good faith  — among them denial of notice of the claim and denial of a reasonable opportunity to be heard).

[52] *Donnell*, 28 P.3d at 426.

summary judgment motion, the trial court accepted as true plaintiff's allegations that peer review was conducted in a sloppy, negligent manner. The Kansas Court of Appeals affirmed summary judgment in favor of the defendant, finding that the problem from plaintiff's standpoint "is that these defendants are immune under state law from liability even if they were sloppy, even if they were negligent, and indeed, even if their conclusions were wrong."[53]   In other words, a sloppy and negligently conducted peer review is not synonymous with bad faith and malice.  The court went on to state that "[a]s near as we can determine, Dr. Donnell does not even contend that the defendants acted in bad faith and with malice, and there is absolutely no evidence on the record which would indicate that the defendants acted in bad faith and maliciously."[54]  Here, Dr. D'Souza, unlike Dr. Donnell, has alleged that CCHC did not act in good faith.  Furthermore, Dr. D'Souza's former employer — unlike Dr. Donnell's former employer — failed to comply with its bylaws by not informing the physician of the peer review investigation.  A reasonable juror could conclude that if CCHC wanted to conduct a fairminded review of the K.H. matter, it would have followed its own bylaws by notifying Dr. D'Souza of the investigation and by giving him an opportunity to provide information.  On the other hand, CCHC's failure to follow its bylaws might be nothing more than an oversight. Whether CCHC's actions demonstrate only a sloppy, negligently conducted peer review or one conducted with the absence of good faith is an issue for the factfinder.   At the summary judgment stage, it is not the trial court's function to weigh the evidence.[55]  Accordingly, CCHC is not entitled to summary judgment on the basis of statutory immunity because there is a

---

[53] *Id.*

[54] *Id.*

[55] *Anderson*, 477 U.S. at 249.

17

genuine issue as to whether CCHC acted in good faith.

### B.      Insufficient Evidence to Support the Remaining Claims

The remainder of this order examines each of Dr. D'Souza's claims for relief with the exception of plaintiff's claim for tortious interference with a contract, which plaintiff acknowledges should be dismissed.[56]

### 1.      Breach of Contract Claim

Dr. D'Souza argues that the Medical Staff Bylaws constitute a contract, which CCHC breached when it conducted the peer review investigation of the K.H. incident and reported it to the Board of Healing Arts.  To prevail on a breach of contract claim, Dr. D'Souza must show: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract, and (5) damage to the plaintiff caused by the breach.[57]

Defendant argues plaintiff has not come forward with any facts that would establish the first two elements of a breach of contract claim: a valid contract supported by consideration.  CCHC directs the court to *Vesom v. Atchison Hospital Association,* an unpublished decision from the District of Kansas in which the court concluded hospital bylaws do not constitute a contract.[58]  It appears *Vesom* is the only opinion in which a court has evaluated whether Kansas law would support plaintiff's contention that the hospital bylaws create a contract.  In *Vesom,* the court granted

---

[56] *See* Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 82) at p. 43.

[57] *City of Andover v. Southwestern Bell Telephone, L.P.*, 153 P.3d 561, 565 (Kan. Ct. App. 2007) (quoting PIK Civ. 3d 124.01-A) (outlining the essential elements of a breach of contract claim).

[58] *See Vesom v. Atchison Hosp. Assn.*, No. 04-2218-JAR, 2006 WL 2714265, at *16-17 (D. Kan. Sept. 22, 2006) *aff'd* 279 Fed. Appx. 624 (10th Cir. 2008)).

18

summary judgment in favor of the defendant hospital on the plaintiff physician's 42 U.S.C. § 1981

race discrimination claim.  Section 1981 claims deal with the making and enforcing of contracts, and

plaintiff based his claims on the hospital bylaws, which he argued constituted a contract.  After

considering case law from other jurisdictions, the court concluded:

> [T]he better-reasoned line of cases hold that hospital bylaws do not
> create a contract. . . . [The hospital] gave no consideration for any
> agreement created by the Bylaws, despite the fact that plaintiff was
> required to abide by them as a consequence of medical staff
> privileges.  Further, the Bylaws are required to be passed by state
> regulation, so [the hospital] is merely complying with the law in
> promulgating Bylaws.  The Court finds, like the Supreme Court of
> Iowa, that construing medical staff bylaws as a contract could
> actually be contrary to public policy.[59]

Plaintiff states that he respects but disagrees with the court's reasoning in *Vesom*; however,

plaintiff makes no argument as to why this case is factually distinguishable from *Vesom* or why this

court should depart from the conclusion reached in *Vesom*.  In short, plaintiff has failed to point the

court to any facts showing that the Medical Staff Bylaws constitute a contract or that there was any

consideration.[60]  Therefore, plaintiff failed to come forward with sufficient evidence to establish a

breach of contract claim.

In seemingly abandoning the theory that the hospital bylaws constitute a contract, Dr.

D'Souza now puts forth the theory that the employment agreement created a contract, and CCHC

breached the contract by removing him from the hospital's call schedule.  He points the court to the

---

[59] *Id.* at *17 (referencing *Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 285-87 (Iowa 1998)).

[60] Defendant acknowledges that the employment agreement required Dr. D'Souza to comply with the bylaws but argues the employment agreement cannot be the contract upon which Dr. D'Souza asserts his breach of contract claim because the employment agreement required only Dr. D'Souza to comply with the bylaws, not the hospital.  Dr. D'Souza does not address this argument in his response brief, and therefore, he has failed to meet his burden of coming forward with any controverted facts that would support the denial of summary judgment as to this claim on this ground.

Amended Complaint, which states: "Lastly, the refusal to include Dr. D'Souza in the call schedule violated his employment agreement with Defendants which requires that all physicians 'shall participate equally in the coverage rotations for the emergency room.'"[61] Dr. D'Souza argues that the court should allow this theory of recovery because the Amended Complaint provided CCHC with fair notice of this claim.  Plaintiff's argument fails to consider the contents of the Pretrial Order (Doc. 72), which mentions nothing of the alleged breach of the employment agreement by failing to include Dr. D'Souza in the call schedule.  It states:

    i.    Breach of Contract

        a.    The employment agreement between Dr. D'Souza and the Defendants required the parties to comply with the Defendants' Bylaws as part fo the employment agreement.

        b.    Defendants failed to provide Dr. D'Souza notice of the investigation in violation of bylaws § 10.3.

        c.    Defendants failed to provide Dr. D'Souza the opportunity to provide information to the investigating body in violation of bylaws § 10.3.[62]

A final pretrial order "controls the course of the action unless the court modifies it."[63]  Once the court enters a final pretrial order, it supercedes all previous pleadings and controls the remaining course of the case.[64]  As the Tenth Circuit has stated, "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint."[65]

---

[61] Amended Complaint (Doc. 19) at p. 12.

[62] Pretrial Order (Doc. 72) at p. 7.

[63] Fed. R. Civ. P. 16(d).

[64] *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457, 474 (2007) (looking to the final pretrial order because it superceded prior pleadings).

[65] *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

The Pretrial Order supercedes the Amended Complaint, and the Pretrial Order does not set forth these facts to support this theory of recovery. For these reasons, the court grants CCHC's summary judgment motion as to plaintiff's breach of contract claim.

### 2. Defamation Claim

Dr. D'Souza alleges CCHC defamed him by making a false report to the Board of Healing Arts and by providing the Oregon Board of Medical Examiners with information concerning that report. The elements of defamation are: "false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed."[66] CCHC argues Dr. D'Souza has developed no evidence showing the falsity of the communications. Furthermore, CCHC contends the statements are qualifiedly privileged, and as such, Dr. D'Souza must prove actual malice. CCHC contends Dr. D'Souza has developed no evidence showing actual malice. As a result, CCHC states it is entitled to summary judgment on the defamation claim.

As an initial matter, the court notes that Dr. D'Souza's response brief admits CCHC's report to the Oregon Board of Medical Examiners is accurate.[67] Therefore, the statement is not actionable, and the court need not address it further. CCHC's report to the Board of Healing Arts requires more discussion. The court first addresses the issue of whether the report to the Board of Healing Arts constitutes a false and defamatory statement and then examines whether the communications at issue are qualifiedly privileged, and if so, whether Dr. D'Souza has set forth evidence showing actual

---

[66] *Hall v. Kansas Farm Bureau*, 50 P.3d 495, 504 (Kan. 2002) (citing *Luttrell v. United Tel. Sys., Inc.*, 683 P.2d 1292 (Kan. Ct. App. 1984)).

[67] *See* Memorandum in Opposition to Summary Judgment Motion (Doc. 82) at p. 10, ¶ 29 ("Dr. D'Souza acknowledges that Defendant's statement contained in ¶ 126 was accurate — 'One case [was] submitted to the Kansas Board of Healing Arts for quality concerns. Contact the State Board of Healing Arts for more information.'").

malice.

### i.      False and Defamatory

In order to state a claim for defamation, the communication at issue must be both false and defamatory.[68]  Whether a statement conveys a defamatory meaning is for the court to decide.[69] Generally speaking, a defamatory statement is one that "tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.  It necessarily . . . involves the idea of disgrace."[70]  In deciding whether a statement is defamatory, the court must remain vigilant of the possibility that a statement could reasonably be understood as implying a defamatory meaning.[71]

In this case, CCHC made a report to the Board of Healing Arts, which alleged several factual occurrences.  The purpose of the report was to indicate the hospital's belief that plaintiff had provided substandard care.  Indeed, plaintiff's response brief states that the "knowingly false statement" in this case was that "the timeliness of [the] physician's response to evaluate the patient may have made injury reasonably probable."[72]  This is the defamatory implication of submitting the report even though the report does not expressly state that timeliness made injury reasonably probable.  Nevertheless, submitting a report suggesting a physician provided substandard care is

---

[68]  *Woodmont Corp. v. Rockwood Center Partnership*, 811 F. Supp. 1478, 1481 n.1 (D. Kan 1993) (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990).

[69]  *Woodmont Corp.*, 811 F. Supp at 1481 (citing *Southern Air Transport, Inc. V. Am. Broadcasting Companies, Inc.*, 877 F.2d 1010, 1013-1014 (D.C. Cir. 1989).

[70]  *Gobin v. Globe Publ'g Co.*, 649 P.2d 1239, 1243 (Kan. 1982).

[71]  *Woodmont Corp.*, 811 F. Supp at 1481.

[72]  *See* Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 82) at p. 8.

defamatory, as it is likely to diminish the esteem,  respect, and confidence in plaintiff's ability amongst the public and his peers.[73] Therefore, a report made for the purpose of reporting substandard care reasonably implies, if not expressly denotes, a defamatory meaning.[74]

CCHC does not dispute the report to the Board of Healing Arts is defamatory.  Rather, CCHC argues plaintiff cannot meet his burden of showing the report was false because the report is true.  As an initial matter, the court notes that Dr. D'Souza makes several attempts to controvert the truth of the allegations in the hospital's report to the Board of Healing Arts, but the court disregards many of Dr. D'Souza's assertions because he fails to cite proper evidence in the record.[75] Nevertheless, even if the court takes the plaintiff's view of the facts, the alleged falsities in the report are either immaterial or are too minor to be actionable.

The Kansas Supreme Court in *Hein v. Lacy* held that "[f]or there to be liability for defamation, there must be a publication of a matter that is both defamatory and false.  Where published statements are substantially true, there is no liability."[76] The court cited with approval the Restatement (Second) of Torts § 581A, comment (f), which states that "[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."  The plaintiff

---

[73] *See id.* (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990) (considering a statement that was impliedly defamatory and stating "[t]he usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication *to have been intended* in the defamatory sense") (emphasis in original)).

[74] *See id.*

[75] Dr. D'Souza attempts to articulate both in his facts section and in his arguments section how the report to the Board of Healing Arts was false.  *See* Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 82) at p. 8-9, 36-41.  However, numerous assertions contain no citation to the record, and therefore, the court may properly disregard them.  As previously explained, the court may properly disregard the unauthenticated, unsworn letter of Dr. Mikinski as evidence that K.H. was not in cardiogenic shock, as the report states.  The court may also properly disregard portions of Dr. D'Souza's affidavit as to matters which Dr. D'Souza lacks personal knowledge.

[76] *Hein v. Lacy*, 616 P.2d 277, Syl. ¶ 1 (Kan. 1980).

23

in *Hein* was a candidate for office who sued the state chairman of an opposing political party after he distributed a brochure stating that the plaintiff had voted for the decriminalization of marijuana and the legalization of homosexuality.[77]   The Kansas Supreme Court found that although the statements were not literally true, they were substantially true because plaintiff had voted in favor of two bills, one which would have lowered the criminal penalty of marijuana and another that would have made sodomy between consenting adults legal, including those of the same sex. Therefore, when determining whether CCHC's report to the Board of Healing Arts is actionable, the court should look to the defamatory communication as a whole and decide whether it is substantially true — that is, whether it is justified despite slight inaccuracies.

The Tenth Circuit in *Rinsley v. Brandt*, applying Kansas law, found that a false statement was so similar to the actual truth that the statement was not actionable.[78]   Dr. Rinsley was a psychiatrist who brought a invasion of privacy / false light action against an author of the book *Reality Police: The Experience of Insanity in America*, which addresses the treatment of patients in mental institutions.   The court considered the author's statement that a patient's parents "instituted a suit against Rinsley" to be substantially true, even though the parents never actually commenced an action.   This is because the patient's parents did see a lawyer.[79]   The Tenth Circuit agreed with the district court's holding that "the difference between the meaning conveyed and the actual truth

---

[77] Although *Hein* involved a public figure, courts have applied *Hein*'s holding in cases involving non-public figures.   *See, e.g., Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir. 1983) (applying Kansas law and citing *Hein* and agreeing with the trial court "that any inaccuracy in the statement was too minor to be actionable" and declining to reach the issue of whether plaintiff is a public figure); *Bundren v. Parriott*, No. 06-3270, 2007 WL 2405258 (10th Cir. 2007) (stating that the district court found that statements about a physician made to the American College of Obstetricians and Gynecologists were substantially true but affirming the district court's decision on other grounds).

[78] *Rinsley*, 700 F.2d at 1308.

[79] *Id.*

is simply too slight to be actionable" because "[t]o the author, and to many lay people, no doubt, the technical difference between 'instituting' a suit and going to see a lawyer about filing a suit is insignificant."[80]

Likewise, in *Kinney v. Daniels*, a court in the Southern District of West Virginia determined that a letter sent by the chief of medicine to a physician, and carbon copied to other hospital officials, was not "false" despite minor inaccuracies.[81]  The letter stated: "I could not find a clear indication why these [three] patients were placed on hemodialysis (or even considered for the procedure)."[82]  In fact, plaintiff had placed only one of the three patients on hemodialysis.  The court concluded the parenthetical clause makes the sentence substantially true, "given its 'sting' that these patients were inappropriate candidates for hemodialysis and the fact that the Plaintiff had at least considered administering the treatment to [the two who did not receive hemodialysis]."[83]  In other words, the fact that plaintiff had not placed two of the patients on hemodialysis was inconsequential because the defamatory meaning would be the same regardless of the inaccuracy.

The Supreme Court of Maine in *McCullough v. Visiting Nurse Service of Southern Maine, Inc.* also concluded that a substantially true statement was insufficient to support a defamation claim.[84]  In that case, plaintiff was fired from her job with the Visiting Nurse Service.  Shortly after defendant terminated her employment, another nurse told coworkers plaintiff had been fired because of "several incidents."  In fact, plaintiff had been fired for only two incidents.  However, the  court

---

[80] *Id.* (citing with approval the district court's conclusion).

[81] *Kinney v. Daniels*, 574 F. Supp. 542, 545 (S.D.W.Va. 1983).

[82] *Id.*

[83] *Id.* at 546.

[84] *See McCullough v. Visiting Nurse Svs. of S. Maine*, 691 A.2d 1201, 1204 (Maine 1997).

concluded the statement was substantially true even though it may have been technically inaccurate. The court reasoned that "[t]o a reasonable person, the statement that McCullough was not discharged because of several incidents is no more damaging to her reputation than an accurate statement would have been, namely, that she had been discharged because of two incidents."

Turning to the case at hand, plaintiff has failed to raise a material issue of fact showing that CCHC's report to the Board of Healing Arts was false. Both parties appear to agree that the "sting" of the report is that Dr. D'Souza's response time was too lengthy, thereby making injury to the patient reasonably probable. Medical staff board meeting minutes and the report of the independent reviewer also reveal concerns regarding timeliness, specifically the time it took Dr. D'Souza to arrive at the hospital after being called at 6:10 a.m., and the time it took Dr. D'Souza to administer tPA.[85]  The report to the Board of Healing Arts states Dr. D'Souza arrived at 6:59 a.m.,[86] but plaintiff argues that he arrived at 6:55 a.m. Indeed, K.H.'s medical records contain inconsistent information, indicating on one page that Dr. D'Souza arrived at 6:55 a.m. and indicating on another page that he arrived at 6:59 a.m. However, the report from the KMS independent reviewer states that at most it should not have taken the physician more than thirty minutes to arrive at the patient's bedside from the time he was called.[87]  Therefore, even if Dr. D'Souza had arrived at 6:55 a.m., this would still be outside the critical thirty-minute window the independent reviewer found applicable.

---

[85]  *See*, *e.g.*, Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. EE, Report of Independent Reviewer, (Doc. 76-32) at pg. 3 (stating that the reviewer felt that "the care was completely medically appropriate and the transfer was correct," other than the physician's response time and the delay in administration of tPA).

[86]  *See* Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76)*,* Ex. GG, Report to the Board of Healing Arts (Doc. 76-34) at p. 3.

[87]  *Id.* (stating that "the physician's 50-minute interval between being called and making it to the patient's beside is excessive and in and of itself exceeded the 30-minute door to needles time for TPA administration").

26

Nevertheless, Dr. D'Souza argues that CCHC had a policy that a physician must see the patient within forty-five minutes of being called.  Although Dr. D'Souza has presented scant evidence suggesting CCHC had such a policy at some point, the policy is irrelevant to the determination of whether the report to the Board of Healing Arts is false.  Nowhere in the report does CCHC suggest that Dr. D'Souza's response time was inappropriate because he failed to comply with a policy.  The report does not even reference a thirty-minute or forty-five-minute policy.  Rather, the Dr. D'Souza's response time is inappropriate because other physicians believed the standard of care dictates no more than  a thirty-minute response time.

Dr. D'Souza's speculation as to why the independent reviewer found a thirty-minute response time was appropriate also is not probative as to the issue of falsity.  Dr. D'Souza argues the reviewer focused on the delay because he or she erroneously believed that Dr. D'Souza was an emergency room physician and was immediately available; however, the report clearly shows the reviewer contemplated the possibility that Dr. D'Souza was not at the hospital when K.H. arrived:

> Again, this reviewer is applying a community standard, which implies the ready availability of an emergency room physician to the patient's bedside within 5 to 10 minutes.  Of course, if the patient's physician were in the community, i.e., living in town or possibly even on a farm, certainly more time should be allowed for the physician to arrive at the patient's bedside; but this reviewer would say definitely not more than 30 minutes.[88]

The report demonstrates the reviewer would have still considered Dr. D'Souza's response time inappropriate regardless of whether he was at the hospital when notified of K.H's arrival.

Additionally, the report to the Board of Healing Arts states that tPA was administered to at 7:30 a.m.  Dr. D'Souza argues he administered tPA at 7:33 a.m.  This inconsistency in Dr.

---

[88] Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 76), Ex. EE, Report of Independent Reviewer, (Doc. 76-32) at p. 3.

D'Souza's favor is irrelevant, as the external reviewer's report opines that tPA should have been administered within thirty minutes of K.H.'s arrival.  The fact that Dr. D'Souza has produced an expert witness who would disagree with the conclusion of the independent reviewer merely reflects a difference in opinion concerning the applicable standard of care and does not prove the report is false.

Other alleged falsities contained in the report are immaterial.  The report states an EKG was done on admission.  Plaintiff contends he ordered an EKG when the nurse called to inform him of K.H's' arrival.  The report states K.H. was in cardiogenic shock, but one of plaintiff's expert witnesses testified that he did not think K.H.'s vital signs supported this conclusion.  Dr. D'Souza alleges the report contained other falsities that he fails to support with proper citation to the record. He contends he did not live one block away from the hospital, as the report states, because his street does not have blocks.  He contends K.H. did not die during left heart catheretization but died when her family requested she be removed from life support.  He also disputes the time K.H. left the hospital.  However, Dr. D'Souza's response brief states that the "knowingly false statement" is that Dr. D'Souza's response time made injury reasonably probable.[89]  Even if the report had been drafted exactly as Dr. D'Souza proposes, the report would be no less defamatory.  In other words, applying the same logic as the Tenth Circuit in *Rinsley*, this court finds that any errors contained in the report are not so different from the actual truth to be actionable.  Because the report is substantially true, Dr. D'Souza's defamation claim fails.  Nevertheless, the court addresses the issue of qualified privilege.

### ii.    Qualified Privilege

---

[89] *See* Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 82) at p. 8.

Qualified privilege is an affirmative defense to a defamation claim.[90]  Whether a defendant is entitled to assert qualified privilege depends on the status of the defendant and the context in which the communication was made.[91]   Under Kansas law, a qualified privilege exists with respect to communications made in good faith and limited in scope between those with a special interest or duty in the subject matter.[92]  The determination of whether a qualified privilege exists "is a matter of law for the court when facts upon which a determination must stand are undisputed."[93]   Courts generally restrict the defense to situations in which "public policy is deemed to favor the free exchange of information over the individual's interest in his or her good reputation."[94]   Kansas courts have routinely found that qualified privilege exists when a communication involves matters of public concern and employer-employee relations.[95]

CCHC's report to the Board of Healing Arts and the Oregon Board of Medical Examiners is the type of communication to which a qualified privilege applies.  CCHC, as Dr. D'Souza's employer, and the Board of Healing Arts, as the agency that licenses Dr. D'Souza, have a common interest in the level of care he provided to patients.  Aside from the shared interest, CCHC had a

---

[90] *Turner v. Halliburton Co.*, 722 P.2d 1106, at 1112 (Kan. 1986).

[91] *Id.*

[92] *Id.*; *see also Lloyd v. Quorum Health Res., LLC*, 77 P.3d 993, 1000 (Kan. Ct. App. 2003) (stating that a hospital's CEO and the physician's employer owed a duty to the board to investigate claims made about the physician and therefore, a report made to the board was subject to a qualified privilege).

[93] *See Dobbyn v. Nelson*, 579 P.2d 721,723(Kan. Ct. App. 1978).

[94] *Id.*

[95] *See* PIK Civ. 4th 127.53 (citing cases)*; Dominguez v. Davidson*, 974 P.2d 112, Syl. ¶ 5 (Kan. 1999) ("Where there is qualified privilege, the injured party has the burden of proving not only that the statements were false, but also that the statements were made with actual malice, that is, with an actual evil-mindedness or specific intent to injure."); *Turner*, 722 P.2d at 1113 (explaining the concept of qualified privilege and defining "actual malice").

statutory duty to make a report to the Board of Healing Arts after the peer review committee and the external reviewer assigned a Standard of Care Level 3 to the care provided by Dr. D'Souza. Kansas regulations define a Standard of Care Level 3 as "standards of care not met, with injury occurring or reasonably probable."[96]  K.S.A. 65-4923 requires medical facilities report incidents of substandard medical care in which the action "had a reasonable probability of causing injury to a patient."[97]

Likewise, CCHC, as Dr. D'Souza's former employer, and the Oregon Board of Medical Examiners, the state agency from which Dr. D'Souza sought a license, also share a common interest in the care Dr. D'Souza provided patients. Kansas courts have overwhelmingly found the existence of a qualified privilege in situations involving communications between former and prospective employers based on their shared common interest in the competency of employees, an analogous situation.[98]  The facts in this case present an even greater  argument for existence of a qualified privilege. Public policy favors the free exchange of information between hospitals and the agencies responsible for licensing physicians. One court opined that if a qualified privilege "should *ever* operate, indeed if there is one instance where society should encourage uninhibited communication, it is in the review of the competency of medical professionals."[99]  These considerations are paramount to physicians' interests in their own reputation, as this process helps insure the competency of physicians. For these reasons, the court finds both communications were qualifiedly

---

[96] K.A.R. 28-52-4(a)(3).

[97] K.S.A. 65-4923(a)(2).

[98] *El-Ghori v. Grimes*, 23 F. Supp. 2d 1259, 1269 (D. Kan. 1998)

[99] *Sibley v. Lutheran Hosp. of Maryland, Inc.*, 871 F.2d 479, 484 (4th Cir. 1989) (emphasis in original).

privileged.

Where a qualified privilege exists, the plaintiff has the burden of proving the communication was made with actual malice.[100]  To prove actual malice, the plaintiff must show the communication "was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not and that it was made with actual evil-mindedness or specific intent to injure."[101]  The determination of whether a defendant acted with actual malice is usually one for the factfinder.[102]  As previously explained, courts have cautioned against granting summary judgment when the resolution of the dispositive issue necessitates a determination of the state of mind of one of the parties.[103]  However, Kansas courts have also observed that summary judgment may be appropriate if the plaintiff fails to point to evidence of an extrinsic character to prove actual malice and if "the language of the communication and circumstances attending to its publication by the defendant are as consistent with the nonexistence of malice as with its existence."[104]  In such instances, "there is no issue for the jury."[105]

Although the court concluded there was a triable issue as to good faith in the context of the

---

[100] PIK Civ. 4th § 127.53.

[101] *El-Ghori*, 23 F. Supp. 2d at 1270 (considering a defamation claim arising from workplace communications and concluding that Kansas law requires plaintiffs to prove common law malice, defined as an evil-mindedness or specific intent to injure, and *New York Times Co. v. Sullivan* malice, defined as knowledge of falsity or reckless indifference as to whether the matter was false); *see also* PIK Civ. 4th § 127.53 (incorporating both standards and describing plaintiff's burden to prove common law malice and *New York Times Co. v. Sullivan* malice).

[102] *Turner*, 722 P.2d at 1113.

[103] *Davis v. Hildyard*, 133 P.3d 827, 833 (Kan. Ct. App. 2005) (quoting *Gleichenhaus v. Carlyle*, 597 P.2d 611 (Kan. 1979)).

[104] *Dominguez*, 974 P.2d at 114, Syl. ¶ 6.

[105] *Id.*

peer review immunity statutes, such is not the case here.  Kansas courts have yet to define what it means for a medical facility to act in good faith when engaging in peer review and reporting. Accordingly, this court declined to conclude that plaintiff's evidence was insufficient, as a matter of law, to establish a lack of good faith.  Nevertheless, Kansas courts have spoken about what a plaintiff must show to establish actual malice in the context of the common law qualified immunity defense: (1) knowledge of falsity or reckless disregard as to falsity; and (2) an actual evil-mindedness or specific intent to injure.  As previously discussed, Dr. D'Souza cannot show the communications are false because the report to the Oregon Board of Medical Examiners is true and because the report to the Board of Healing Arts is substantially true.  Likewise, Dr. D'Souza's has pointed to no evidence showing that CCHC acted with reckless disregard as to the truth or falsity of the communications.  Finally, Dr. D'Souza's evidence of coworker discord, lack of compliance with the bylaws, and the factual timeline surrounding the K.H. incident does not demonstrate that CCHC acted with actual evil-mindedness or a specific intent to injure Dr. D'Souza.[106]  For these reasons, the court grants defendant's summary judgment motion as to plaintiff's defamation claim.

3.      **False Light Claim**

Dr. D'Souza alleges CCHC placed him in a false light by communicating false information to the Board of Healing Arts and the Oregon Board of Medical Examiners.  The Kansas Supreme Court has recognized a cause of action for invasion of privacy, which includes a false light privacy

---

[106] *Lloyd*, 77 P.3d at 1001 (discounting evidence of actual malice as too speculative when a plaintiff and defendant did not have a good relationship and defendant wanted plaintiff out of a hospital's obstetrics department); *Clevenger v. Catholic Social Serv.*, 901 P.2d 529, 531 (Kan. Ct. App. 1995) ("[A] record which requires an inference of malice merely from the fact that the information was reported or investigated or from negligence in the reporting and investigation of the information is not sufficient to withstand a motion for summary judgment.").

action.[107]   Under Kansas law, one who gives publicity to another that places the person before the public in a false light, of the kind highly offensive to a reasonable person, is liable for invasion of privacy.  A false light claim is a subcategory of an invasion of privacy claim.  In order to prevail on a false light claim, a plaintiff must show (1) publication of some kind to a third party; (2) the publication must falsely represent the person, and (3) the representation must be highly offensive to a reasonable person.[108]   Courts treat defamation and false light claims similarly in that truth and privilege are defenses available in both causes of action.[109]   Accordingly, Dr. D'Souza's false light claim must fail for the same reasons his defamation claim fails.  CCHC's communication to the Board of Healing Arts and the Oregon Board of Medical Examiners is subject to a qualified privilege and Dr. D'Souza has failed to come forward with evidence establishing actual malice.  CCHC's communication with the Oregon Board of Medical Examiners is true, and CCHC's report to the Board of Healing Arts is substantially true.  Therefore, the court grants defendant's summary judgment motion as to plaintiff's false light claim.

### 4.      Retaliation Against a Whistleblower Claim

Dr. D'Souza contends CCHC retaliated against him for making good faith reports about the quality of care provided by other CCHC physicians.  The Kansas Supreme Court has stated that "termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law

---

[107] *See Froelich v. Adair*, 516 P.2d 993, 995-96 (Kan. 1973).

[108] *Dominguez*, 974 P.2d at 121 (citing *Castleberry v. Boeing Co.*, 880 F. Supp. 1435, 1442 (D. Kan. 1995)).

[109] *Lloyd*, 77 P.3d at 1002.

enforcement officials (whistle-blowing) is an actionable tort."[110]   To that end, plaintiff has the burden of showing:

> (1) that a reasonably prudent person would have concluded that the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare, (2) that the employer had knowledge of the employee's reporting of such violation prior to the discharge of the employee, and (3) that the employee was discharged in retaliation for making the report.[111]

Additionally, "the whistle blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain."[112]   Plaintiff must prove this claim by a preponderance of the evidence that is clear and convincing in nature.[113]

As an initial matter, the court has difficulty determining what facts Dr. D'Souza alleges give rise to this claim. What is clear, however, is that Dr. D'Souza cannot state a prima facie case of retaliation against a whistleblower because he has failed to come forward with any evidence, much less clear and convincing evidence, showing CCHC discharged him in retaliation for his whistleblowing activities.  In his response brief, Dr. D'Souza alleges he meets the first element of his retaliation claim by showing that CCHC physicians sent him a letter stating they would no longer see his patients in the emergency room, which Dr. D'Souza contends would be violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA").  However, the court cannot see

---

[110] *Palmer v. Brown*, 752 P.2d 685, 690 (Kan. 1988).

[111] *Zinn v. McKune*, 949 F. Supp. 1530, 1537 (D. Kan. 1996) (applying Kansas state law and listing the elements of a retaliatory discharge claim).

[112] *Id.*

[113] *Id.*

where Dr. D'Souza has ever alleged he reported this suspected violation. Furthermore, there is no evidence that any CCHC physicians refused to provide appropriate medical screening for individuals presenting in the ER. Therefore, these facts are not sufficient to establish this claim.

Dr. D'Souza also claims he lodged complaints about alleged substandard medical care provided by other CCHC physicians. He attempts to establish a causal connection between the reporting and his discharge by pointing to the deposition testimony of Dr. Jindra in which she states the letter refusing to cover Dr. D'Souza's patients is a "consequence." Therefore, Dr. D'Souza claims "it is evident that the actions were taken in retaliation for Dr. D'Souza expressing his complaints . . . "[114] It appears Dr. D'Souza is alleging the letter was a consequence of Dr. D'Souza's reports of substandard medical care. Nevertheless, this evidence does not demonstrate or even suggest the hospital declined to renew Dr. D'Souza's contract because of the alleged reporting. Dr. D'Souza fails to direct the court to any evidence demonstrating a causal connection between his alleged whistleblowing activities and his discharge.[115] According, the court grants CCHC's summary judgment motion as to this claim.

### 5. Claim for Tortious Interference with a Current or Prospective Business Relationship

The elements of a claim for tortious interference with a prospective business relationship are: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the

---

[114] Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 82) at p. 43.

[115] *See Zin*, 949 F. Supp. at 1538 (dismissing plaintiff's complaint because she failed to procure clear and convincing evidence demonstrating a causal connection between whistleblowing and termination).

relationship or realized the expectancy; (4) intentional misconduct by the defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.[116]

CCHC argues that Dr. D'Souza has failed to produce evidence supporting any of these elements. The Pretrial Order (Doc. 72) in this case states that the basis for recovering on his tortious interference with a current or prospective business relationship is:

a. Defendants reported their findings to the K.B.H.A. [Board of Healing Arts] knowing that Dr. D'Souza would be obligated to report any adverse findings, regardless of their truth or accuracy, when seeking licensure, privileges, insurance and/or employment.

b. Defendants further knew that Dr. D'Souza's ability to seek and practice medicine in any state would require him to disclose any adverse findings that implicated his ability to provide quality healthcare.

c. The Defendant knew, or should have known, of current and/or prospective business and/or economic advantages to Dr. D'Souza in Kansas and Oregon with the probability of future economic benefit.[117]

Dr. D'Souza further expands on this theory in his response brief. He states that CCHC interfered with his prospective relationship with the Mowery Clinic, the Portland Clinic, and the relationships he had with his patients. Dr. D'Souza alleges CCHC interfered with his business relationship with his patients by sending them letters encouraging them to see other CCHC physicians and informing them Dr. D'Souza's contract would not be renewed. However, the Pretrial Order contains no information suggesting that CCHC's letters to patients is a fact giving rise to this claim. Accordingly, Dr. D'Souza is prohibited from attempting to articulate a new theory at this

---

[116] *Burcham v. Unison Bankcorp, Inc.*, 77 P.3d 130, 151 (Kan. 2003).

[117] *See* Pretrial Order (Doc. 72) at p. 8.

juncture in order to avoid summary judgment.[118]  However, even these new facts are insufficient to state a claim for tortious interference with a business relationship.  As near as the court can tell, Dr. D'Souza has failed to even allege he suffered damage as a result of letters, and Dr. D'Souza has failed to point to any evidence showing that but for the letters, he was reasonably certain to have continued the relationship with his patients.[119]

Dr. D'Souza's theory that CCHC tortiously interfered with his business relationship with the Portland Clinic similarly fails.  It appears plaintiff is alleging CCHC interfered with Dr. D'Souza's contract with the Portland Clinic by filing a report with the Board of Healing Arts because CCHC should have known such a report would jeopardize his prospects for employment.  However, Dr. D'Souza offers no evidence, other than conclusory statements contained in his own affidavit, establishing the report jeopardized his employment at the Portland Clinic, delayed his credentialing, or otherwise caused damages.[120]

Finally, Dr. D'Souza's theory that CCHC tortiously interfered with his business relationship with the Mowery Clinic also fails.  Dr. D'Souza appears to allege CCHC tortiously interfered with his prospective relationship with the Mowery Clinic based on comments made by a CCHC administrator.  In support, Dr. D'Souza points the court to Mowery Clinic meeting minutes from

---

[118] *See Rockwell Intern. Corp.*, 549 U.S. at 474.

[119] Indeed, Dr. D'Souza points out that upon receiving the letters, some of his patients were so unhappy about CCHC's decision not to renew his contract that they took out an ad in the local paper expressing their discontent.

[120] *See*, *e.g.,* Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 76), Ex. C, Affidavit of Dr. D'Souza (Doc. 82-6) at p. 3 ("Due to CCHC's misconduct in failing to inform me of the ongoing peer review investigation, I was forced to undergo [a] supplemental inquiry regarding the investigation, my Kansas license and credentialing[,] resulting in over six months of lost income.").

January 26, 2006.[121] The document merely states that the hospital administrator had made comments about Dr. D'Souza that a Mowery Clinic physician found "a little concerning."[122] This evidence is insufficient to establish intentional misconduct by CCHC. More importantly, the Mowery Clinic offered Dr. D'Souza a position, which he turned down, and therefore, the court is unclear what damages plaintiff believes he suffered as a result of this hospital administrator's statements. Because plaintiff has failed to point the court to sufficient evidence supporting claim for tortious interference with a current or prospective business relationship, the court grants defendant's motion for summary judgment as to this claim.

### 6. Claims for Injunctive & Declaratory Relief

CCHC's motion for summary judgment also argues that plaintiff's claims for injunctive and declaratory relief should be rejected because they are based on the previously discussed claims, all of which have been denied.[123] As a result, plaintiff's claims for injunctive and declaratory relief are

---

[121] *See* Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 76), Ex. O, Mowery Clinic Meeting Minutes, January 26, 1006, (Doc. 82-16) at p. 2.

[122] *Id.*

[123] *See Gates v. Spring Spectrum, L.P.*, 523 F. Supp. 2d 1287, 1291 (D. Kan. 2007) (citing cases and concluding that a claim for injunctive relief must be dismissed because it was derivative of another claim dismissed on summary judgment); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2d Cir. 1993) ("Where a district court has before it a declaratory judgment action and a direct action containing all of the issues in the declaratory judgment action, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint."). The Pretrial Order (Doc. 72) provides that plaintiff requests an order declaring that:

> (a) Defendants violated Kansas law as it relates to their report of him to the K.B.H.A. [Board of Healing Arts]; (b) Defendants failed to give him proper notice and conducted the peer review investigation in violation of their bylaws; (c) Defendants breached their employment agreement with Dr. D'Souza by violating Kansas law and their bylaws; and (d) Defendants' investigation violated their bylaws, the findings were inconsistent with facts available at the time, and Defendants' should not [] republish[] their conclusions

For reasons previously discussed, there is not sufficient evidence before the court supporting the declaration plaintiff seeks.

dismissed.

Accordingly,

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 75) is hereby GRANTED.  Judgment shall be entered in favor of defendant in accordance with this order.

**IT IS SO ORDERED.**

Dated this 31st day of March, 2009, at Topeka, Kansas.


s/ K. Gary Sebelius
K. Gary Sebelius
U.S. Magistrate Judge